People v A.L. (2024 NY Slip Op 24281)

[*1]

People v A.L.

2024 NY Slip Op 24281

Decided on November 1, 2024

Supreme Court, New York County

Conviser, J.

Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.

This opinion is uncorrected and subject to revision before publication in the printed Official Reports.

Decided on November 1, 2024
Supreme Court, New York County

The People of the State of New York,

against
A.L., Defendant.

Indictment No. 168/1996

New York County District Attorney Alvin L. Bragg Jr. (Samuel Cocks and Hannah Pennington, of counsel) for the People.
The Legal Aid Society of New York (Dana Wolfe and Lawrence Hausman, of counsel) for the Defendant.

Daniel P. Conviser, J.

The horrific murder of 6-year old E. I. ("E.") following a history of brutal child abuse at the hands of her mother in November of 1995 shocked New York City and the nation and led to the complete revamping of New York City's child welfare system. After serving 26 years in prison for that murder and at liberty on lifetime parole, the Defendant now seeks to end her parole by virtue of the 2019 Domestic Violence Survivors Justice Act ("DVSJA"). For the reasons outlined here, the Defendant's motion is denied, following an evidentiary hearing.[FN1]

Considering the statutory provisions at issue outlined in PL § 60.12, the court holds that at the time of the murder "the defendant was a victim of domestic violence subjected to substantial physical, sexual or psychological abuse" by her partner, Carlos L. ("Carlos"). The court further holds, however, that this abuse was not "a significant contributing factor to the defendant's criminal behavior". Presuming, however, that this second statutory requirement was met, the court further concludes that the continuation of Ms. L.'s parole would not be "unduly harsh" under the DVSJA. Since, in the court's view, the Defendant does not meet the second and third requisites of the statute, her motion is denied.
 Statement of Facts [FN2]
The Defendant was convicted on June 24, 1996, upon a plea of guilty to Murder in the Second Degree. She now moves for resentencing pursuant to CPL § 440.47 and PL § 60.12, [*2]which were revised in 2019 in accordance with the DVSJA. The Defendant was incarcerated in November 2021 when she applied for resentencing but was subsequently released on parole in April 2022. The People oppose the Defendant's motion.
In a decision and order dated November 17, 2022, this Court found that the Defendant was entitled to an evidentiary hearing under the statute and conducted that hearing on four dates earlier this year. At the hearing the Defendant called one witness: Dr. Lavita Nadkarni, a clinical forensic psychologist. The People called one witness: Ms. Josie Torielli, a licensed clinical social worker. The Defendant elected not to testify at the hearing although she was available to do so.
E. was born on February 11, 1989, the daughter of the Defendant and Gustavo I. ("Gustavo"). Gustavo was not the perpetrator of the intimate partner violence at issue on this motion. At the time of E.'s birth, the Defendant had two other children, R. and K., with a man named Ruben R. She previously lost custody of those children. Shortly after E.'s birth, the child was placed with a foster care agency due to the Defendant's drug use. On May 8, 1989, there was a finding of neglect against the Defendant and on May 25, 1989, E. was discharged to the care of her father Gustavo. Gustavo worked full time and beginning in January 1990, E. attended day care at a private pre-school in Brooklyn. The tuition was paid by Prince Michael of Greece, a benefactor of the school, who also pledged to fund the child's education through the 12th grade. 
The Defendant then did not have custody of her three children at the time and moved into a shelter. While living in the shelter, she met Carlos. They eventually got married and had three children. In December 1990 Ms. L. regained custody of R. and K. and they moved in with the Defendant and Carlos. In January 1991, the court granted Gustavo legal custody of E., with Ms. L. granted visitation rights. Gustavo reported that when E. would visit the Defendant on the weekend, she would return with injuries and bruises. The child was also acting out at school. 
In January 1992, Carlos stabbed Ms. L. numerous times about her head, neck and body while she fed her infant son. He was arrested and pled guilty to Assault in the Second Degree and was sentenced to six months in jail and five years' probation. In March 1992, Gustavo requested that the court order supervision of the Defendant's visitation. The Child Welfare Administration ("CWA") (the predecessor of the Administration for Children's Services) recommended the Defendant's visitation be supervised, but the court did not order that. In December 1993, it was reported that Ms. L. was leaving her children alone and tested positive for cocaine. She was admitted to a drug program, where she admitted using drugs for 10 years.
Gustavo died on May 26, 1994, and E. then went to live with Ms. L., Carlos and the Defendants' now five other children at an apartment in Manhattan. While the court awarded the Defendant temporary legal custody of E., Gustavo's cousin applied for custody of the child. The court granted the Defendant full custody and granted Gustavo's cousin visitation rights. Two months later, the court terminated the cousin's visitation rights even though E.'s pre-school submitted a letter to the court supporting the cousin's petition. The Defendant pulled E. out of her private pre-school even though she received a full scholarship and the school offered transportation to and from the school. Ms. L. enrolled E. in a local public school for kindergarten in the fall of 1994. Case records from the school disclosed the child exhibited signs of physical abuse. The Defendant withdrew her from that school in January 1995 and failed to enroll her in another school.
According to the amended bill of particulars, from May 1994 through November 1995, [*3]the Defendant isolated E. physically and emotionally, deprived her of food and left her alone in the apartment for long periods of time. She and Carlos frequently beat the child about her face, head, and body, turning up the radio to mask her screams. Ms. L. and Carlos physically restrained E.'s arms and legs with a rope while the Defendant inserted the handle of a hairbrush into her anus. While E. was living with the Defendant, she began to urinate and defecate around the apartment. Frustrated by her frequent urination and defecation, the Defendant forced her to eat her own feces and used her head as a mop. Carlos also abused the children in the home, other than E., who were not his biological children.
On November 15, 1995, Carlos was arrested on a parole violation and incarcerated at Rikers Island. On the evening of November 20, 1995, while Carlos was still incarcerated, the Defendant threw E. against a concrete wall, hitting her head. The child was gravely injured, unable to walk or talk and lost consciousness. The Defendant never attempted to get medical attention for E. On November 21, 1995, E. still could not walk or talk and brain fluid leaked from her mouth and nose. Carlos called the Defendant from Rikers Island. Ms. L. told him that E. was sick, and he told her to take the child to the hospital. The Defendant still never sought medical attention for E. On November 22, 1995, Ms. L. told a neighbor that E. was sick. Once the neighbor observed the child's motionless and cold body, he realized she was dead and tried to convince the Defendant to call the police. When Ms. L. failed to do so, the neighbor called 911.
The medical examiner's report documented the child's horrific injuries. She suffered three separate hemorrhages in her forehead area. She had multiple bruises over her face and body and a bone protruding from the fourth finger on her right hand. Her left labia majora was swollen, she had abrasions to the clitoris and perineum and her anus was dilated. The cause of death was listed as child abuse syndrome with blunt impacts to the head and subdural hemorrhage.
The Defendant pled guilty to Murder in the Second Degree and was sentenced to fifteen years to life imprisonment. This meant that the Defendant's two children, ages eight and nine years old, would not be asked to testify against their mother at trial. Carlos pled guilty to Attempted Assault in the Second Degree for banging E.'s head against a wall on October 31, 1995, and was sentenced to 1 ½-3 years incarceration. After serving 26 years in prison, Ms. L. was released on parole in April of 2022.

 THE HEARING TESTIMONY
 
 Testimony of Dr. Lavita Nadkarni

Dr. Nadkarni is a clinical forensic psychologist. She is the Director of Forensic Studies at the University of Denver Graduate School of Professional Psychology. Dr. Nadkarni conducts forensic evaluations for people involved in the court system. She has conducted over 50 evaluations in immigration proceedings, over 1,000 criminal court forensic evaluations, approximately 300 family court evaluations and over 100 civil court evaluations. She has also published articles on domestic and intimate partner violence and has given presentations on the topic. Dr. Nadkarni has testified less than 50 times in multiple states and has never been denied expert qualification. She has testified as an expert for both the government and defense. She was qualified an expert in clinical and forensic psychology.
Dr. Nadkarni has evaluated people who have experienced intimate partner violence and first discussed the general issue. Intimate partner violence includes physical, sexual, or verbal abuse, including threats by a romantic partner. Intimate partner violence can affect an individual's working memory, verbal memory, autobiographical memory, and delayed memory. [*4]Since trauma impacts memories, there are inconsistencies in what trauma victims remember. Such violence can also impact mood, cognition and how a victim interacts with others. Perpetrators of intimate partner violence can exercise coercive control over their victims. Victims of intimate partner violence remain in relationships with their abusers for many reasons including fear, having nowhere else to go, lack of financial support, or fear of losing custody of children.
Victims of domestic violence often fail to report it to law enforcement. Intimate partner violence can increase the tendency of a victim to use substances to cope with the abuse. Such violence can change brain chemistry and make a victim hypervigilant. A blow to the head from an assault can cause a degree of traumatic brain injury. Victims of intimate partner violence may have particular difficulties while incarcerated since the coercion, loss of control and violence inherent in being in abusive intimate partner relationships is replicated, in different ways, in prison. Cognitive defects caused by intimate partner violence can impact a victim's ability to properly care for children. This can lead to neglect. It can also lead to abuse because the victim is hypervigilant and behavioral inhibitions are lowered.
Dr. Nadkarni met with the Defendant virtually on November 17 and December 19, 2023 for a psychological evaluation for a total of approximately four hours. Dr. Nadkarni testified that she was retained to determine if there was intimate partner violence that had occurred in the relationship between the Defendant and Carlos and whether that would have impacted the Defendant's behavior related to E.'s murder. Dr. Nadkarni outlined all of the written materials she reviewed. She was not able to conduct any formal psychological testing because the evaluation was conducted virtually but was able to review some cognitive, reading and writing tests which had been conducted in 2019.
She noted that the Defendant's affect during her interviews was variable. At times it was flat, with no emotion and then fluctuated to being emotional and crying to the point where Dr. Nadkarni needed to stop the interview. Ms. L. spoke about taking medication to help her for sleep along with an antidepressant. She discussed her childhood. She was born in Puerto Rico and lived with her mother. She was the youngest of several children. She moved to the United States when she was three years old. Her mother was involved in multiple relationships, including abusive ones. Ms. L. revealed that from the age of seven to eleven she was sexually abused by various boyfriends of her mother. She stated that she never disclosed the abuse to anyone. As a result of the abuse, she suffered depression and it affected her schooling. She ended up dropping out of school in the ninth grade.
Ms. L. discussed three major relationships she had with the fathers of her children. Her first relationship was with Ruben R., the father of her first two children, R. and K. The relationship was very loving initially but there was some drug abuse, including the use of alcohol, heroin and crack cocaine. She described the relationship as very positive. During it, she started using crack and leaving her children alone in order to use drugs. The couple lost their apartment, their children were removed by Child Protective Services and they split up. After she and Ruben split up, Ms. L. entered a shelter. She then met Gustavo, the father of E., who worked at the shelter. She said that he was physically abusive to her at the beginning of the relationship but she felt that being with him would allow her to regain custody of her two children. The couple separated and E. was removed from Ms. L.'s care into the custody of Gustavo because she was using drugs. Ms. L. then moved to another shelter.
In 1989 she met Carlos, who worked at the shelter. Carlos and the Defendant had three [*5]children together. She was able to regain custody of R. and K. because Carlos had steady employment. All the benefits the couple received, including Medicaid and food stamps, were under his name. The Defendant discussed physical, verbal, and sexual abuse inflicted by Carlos, including him hitting, beating, biting and raping her. Dr. Nadkarni believed that any time the Defendant was struck on the head or hit with a belt, it could have caused a change in her cognitive functioning and could be a mild traumatic brain injury. Carlos also verbally abused her, including yelling at and denigrating her. He would tell her that she was worthless, that he owned her and that he controlled her. While she said the abuse was not a daily occurrence, it would happen when he had been using drugs or alcohol.
On January 13, 1992 Carlos stabbed Ms. L. with a knife 17 times in the neck, head and throat while she was feeding her one-month-old baby and he was arrested. In 1992, the Defendant also reported to Dr. Nadkarni that she was raped in the elevator of her building by a stranger. Dr. Nadkarni stated that as a result of Carlos' abuse, Ms. L. was depressed, anxious and overwhelmed and increased her drug use. Carlos was ten years older than Ms. L. At the time of E.'s murder, Ms. L. had 6 children in the home, all under 10 years old. Dr. Nadkarni testified that Ms. L. was cognitively overwhelmed by the abuse and didn't know how to get out of the situation. The abuse also impacted the Defendant's ability to emotionally connect with her children. Ms. L. increased her use of substances. She was addicted to substances, used heroin and crack cocaine and would leave the children at home alone repeatedly to obtain drugs. Dr. Nadkarni found the Defendant's description of her life circumstances believable.
Dr. Nadkarni testified that the Defendant and E. had a complicated relationship. Ms. L. petitioned for visitation rights in family court and was granted visitation for a weekend prior to E. coming to live with her. Ms. L. described her visitations with E. in loving terms, but also described it as complicated because she disciplined the child as a result of her behavioral issues. In 1994, a teacher brought E. to the Defendant's house late one night saying that Gustavo was sick. Within a few days of E. arriving at the house, Gustavo died. E. was 5 years old when she moved in with the Defendant.
When E. arrived at her home, the Defendant had five other children under the age of eight living with her. E. lived in the home with the Defendant for about 18 months. After E. moved in with the Defendant, she began to exhibit behavioral problems including urinating, defecating and smearing feces on the wall. Dr. Nadkarni testified that E.'s loss of her father and the move from her school in Brooklyn to New York affected the child's functioning. Carlos and the Defendant were overwhelmed by the child's behavior and were abusive in trying to control it. They locked her in a dark room, leaving her alone. The Defendant dragged E., cleaned the floor with her hair and made her eat her own feces. Carlos and Ms. L. often yelled and screamed at E., even in public. The Defendant and Carlos believed that the child was possessed.
There were at least two instances where E. was brought to the hospital. One was for a fractured shoulder and the other was for scalding marks on her feet. The Defendant discussed being overwhelmed even though a caseworker and the Child Welfare Administration were involved in assisting her. "She [Ms. L.] talked about not being able to manage her daughter and her daughter's behavior". Transcript, p. 53. 
Dr. Nadkarni discussed with the Defendant the circumstances surrounding E.'s murder on November 22, 1995. At that time, Carlos had been incarcerated at Rikers Island for a week because of a probation violation, but the Defendant said that Carlos would call her every day. [*6]During his incarceration, he would ask about Ms. L. and the children and would tell her that he would be coming home soon. She felt like he was keeping tabs on her. Her use of alcohol increased. On November 20, 1995, the Defendant slammed E.'s head against a concrete wall, leading to her death. Dr. Nadkarni testified that the Defendant's heavy intake of alcohol during this time altered her memory and caused her to forget certain memories of the days leading up to the child's murder. While the Defendant's acts caused E.'s death, Ms. L. told Dr. Nadkarni that in the days leading up to it, E.'s "health was deteriorating because she had been suffering bruises that were appearing on her body." Hearing transcript, p. 57. The Defendant alleged that the child's bruises were from when Carlos had hit her, but Dr. Nadkarni testified that according to the arrest report, the bruises were caused by Ms. L. Carlos had struck E.'s head into a wall on the Halloween prior to the murder. While Dr Nadkarni believed that the Defendant was minimizing her role in E.'s death, she also testified that the trauma and her heavy alcohol use affected Ms. L.'s ability to recall certain events. 
Dr. Nadkarni testified that she reviewed the autopsy and police reports documenting the condition of E.'s body on the date of her death. Dr. Nadkarni confirmed that the injuries exceeded corporal punishment and were not consistent with discipline. After E. suffered fatal injuries as a result of the Defendant slamming her head against the wall, the Defendant spoke to Carlos on the phone. He told her to take the child to the hospital, but the Defendant did not. The Defendant did not seek medical care for the child for two days. Dr. Nadkarni believed that the Defendant's fear of Carlos and her drug use affected Ms. L.'s ability to respond to the crisis in the days leading up to E.'s death and her ability to problem solve after E.'s head injury. After the Defendant was arrested, she did not report Carlos' abuse to the police because she was afraid of losing her children and being in a police station. She reported the abuse, however, while in prison and at parole hearings. In the days leading up to her death, E. was getting sicker and sicker and Ms. L. was increasing her use of alcohol. Dr. Nadkarni believed that the Defendant's history of intimate partner violence changed Ms. L.'s psychological behavior, her cognitive functioning, and her emotional well-being. She testified that Ms. L. was unable to plan and felt stuck.
Dr. Nadkarni believed that the Defendant felt fear and was threatened and intimidated in the days leading up to E.'s death. She felt isolated, overwhelmed and unable to seek help. Carlos' frequent phone calls to her while she was in jail engendered fear in her that he still had power and control over her. This fear affected her ability to plan and make rational decisions and also caused her to not seek medical care for E. Intimate partner violence impaired Ms. L.'s "working memory", the ability to hold information and use it to complete tasks. Dr. Nadkarni testified that the Defendant said she was remorseful about E.'s death and mentioned her remorse during her appearances before the parole board. Dr. Nadkarni thought Ms. L.'s remorse was genuine. Dr. Nadkarni acknowledged that Ms. L. had not provided any specific examples of things Carlos had directed her to do or not do but said the coercive control he exerted over Ms. L. did not require evidence of such specific commands. 
Dr. Nadkarni testified that Ms. L. participated in programming in prison and felt stronger now. She aspired to help other women who had been survivors of intimate partner violence. Ms. L. was released from prison at what may have been her seventh parole board appearance in April of 2022. She reported being sober in prison, sober now and subject to drug testing in which she had not been found to use illicit substances. Ms. L. suffers from anxiety. She is quick to cry and some of her executive functioning is still impaired. Her functioning has improved. [*7]She meets with her parole officer once or twice per month.
While Dr. Nadkarni testified that there is literature which links intimate partner violence with increased aggression and increased inability to control behavior or punishment toward one's child, there is more literature which links such intimate partner violence with aggression directed towards a victim's abuser. She also testified that trauma which is not a result of intimate partner violence, such as being a victim of childhood sexual abuse, also diminishes executive functioning and causes cognitive issues. Alcohol and drug use also change brain chemistry. She testified that the trauma Ms. L. sustained during her lifetime, complex trauma, was compounded by intimate partner violence. The fact that Ms. L. was subjected to sexual abuse as a child for 4-5 years by multiple offenders inflicted trauma on her. This trauma "had very much a psychological effect on her [Ms. L.]". Transcript, p. 28. It is difficult to separate out the impact of that early trauma with what occurred to Ms. L. later. Ms. L.'s rape in a building elevator by a stranger not long before E. moved into the household was also traumatic.
Dr Nadkarni opined that Ms. L. was subject to substantial intimate partner violence by Carlos. She also opined that the abuse exacerbated Ms. L.'s alcohol and drug use disorders. At the time of E.'s murder, Dr. Nadkarni testified, Ms. L. was in fear, felt threatened, felt intimated, felt controlled, felt isolated and was overwhelmed by having to care for six children. She was unable to obtain help and her substance abuse was impairing her judgment. 
When Dr. Nadkarni was asked the ultimate issue on the motion directly: whether Carlos' abuse was a significant contributing factor in Ms. L.'s decision to murder E., she provided several answers. These came after the court overruled an objection by the People that Dr. Nadkarni was being asked to opine on the ultimate issue before the court. Discussing Ms. L.'s long relationship with Carlos, Dr. Nadkarni first answered the ultimate contested question at the hearing as follows:
[H]er [Ms. L.'s] frame of mind, the constant reminder of him, because he was able to call her and make inquiries, make threats in some way, sort of added to that. So I think the abuse, I believe, was ongoing. Id., p. 69-70.
When the court then again asked what the connection was between Carlos' abuse and Ms. L.'s murder of her daughter, Dr. Nadkarni responded:
I think her having been abused in so many different ways by him created this psychological mindset in her that even just a telephone call from him at a remote distance engendered fear in her that he had still power over her. Control over her. She felt that he could see what she was doing. That he could influence what she was doing. That he was able to come home at any point because he was telling her that. That she couldn't escape. So the fear, the abuse resulted in the fear which affected her ability to plan, to make rational decisions, to not seek medical care. I mean, it affected her cognitive functioning and functioning. The systematic abuse over time. Id., p. 70.
The court then tried to ask the same question again, but more directly. It asked "[i]s that a causative factor for her to murder her daughter, the fear that you are talking about?" Dr. Nadkarni replied:
I think the fear, well, the fear and the use of alcohol, which was disinhibiting her impulses. And the fear and aggression. There was definitely aggression. But the substance use and resulting domestic violence, and the use of substances, the lack of ability to, when she was injured, seek medical help, were all, I believe, contributing factors". Id., pp 70-71.
At another point in her testimony discussing how being the victim of domestic violence reduced a victim's behavioral inhibitions, Dr. Nadkarni said: "I don't want to speak in terms of causation." She described that as the court's prerogative rather than a psychological construct. "It's more correlational. It's more likely than not. But it's not positive". April 24, 2024 transcript, p. 20. Finally, on re-direct examination, Dr. Nadkarni allowed that intimate partner violence "created a significant contribution to her behavior" [with respect to the murder]. Id., p. 46. Discussing how cognitive impairments might have impacted Ms. L.'s ability to control the degree of punishment she inflicted on E., Dr. Nadkarni testified, it was hard to reconcile Ms. L.'s behavior with respect to the murder "with the ability to process information, and then adding the substance use on top of it actually perceiving that correctly". Id., p. 49. She described intimate partner violence as the "umbrella" for Ms. L.'s mental health issues. Id., p. 50.
Testimony of Josie Torielli
Josie Torielli testified for the prosecution. She has been a licensed clinical social worker since 2010. She has been certified as a trauma therapist. Ms. Torielli has served as a consultant working with nonprofits and individuals helping them to understand the impacts of trauma, domestic violence and sexual violence to assist them in working with clients. She has maintained a small private psychotherapy practice since 2009 where she works as a trauma therapist treating patients who have experienced sexual or domestic violence. She has also been a senior lecturer at the Columbia University School of Social Work since 2017. Ms. Torielli has worked with the New York County District Attorney's Office in criminal cases as an expert witness in the fields of trauma, sexual violence, and domestic violence. She has been deemed an expert in trauma, trauma violence and intimate violence in two counties and has never been denied qualification as an expert. She has always testified as an expert on behalf of the prosecution but has provided consultation for the Office of the Federal Defenders. Ms. Torielli was qualified as an expert in psychology with a specialty in trauma, sexual violence and intimate partner violence.
Ms. Torielli did not prepare an evaluation of the Defendant. She reviewed parole hearing reports and Dr Nadkarni's testimony. Ms. Torielli testified about the significant effect trauma, intimate violence and sexual violence have on memory. When trauma is intertwined with substance use, there could also be a loss or gaps in memory.
Ms. Torielli reviewed the testimony of Dr. Nadkarni and found that there was much emphasis in Dr. Nadkarni's testimony on the prevalent substance use throughout the Defendant's history and in particular in the days leading up to E.'s death. Ms. Torielli discussed the moments leading to the decision of the Defendant not to obtain medical help for E. when it was clear she was in a grave condition. What stood out to her in the context of understanding intimate partner violence was that Carlos had directed Ms. L. to get help for E. Ms. Torielli said that was notable, in her experience, because when an individual is in a relationship involving intimate partner violence, there are dynamics of fear and control. The person being controlled typically adapts their behavior to do what the other person wants, not the opposite. There was never a point where Carlos directed the Defendant to abuse E. at the time of her murder. Ms. Torielli did not see the trauma of domestic violence preventing the Defendant from getting medical assistance for E. Ms. Torielli believed that the murder arose because of the Defendant being overwhelmed and using substances which affected her ability to assist E., rather than that Ms. L.'s actions arose because of domestic violence.
Ms. Torielli testified that it is rare for the survivor of physical, sexual and psychological violence to inflict violence on a person other than an abuser. If the person who is subjected to power and control does resort to physical violence it is generally employed toward the person who is exerting violence upon the victim, not to a third party. In addition, Ms. Torielli testified that men are more likely to commit violence against a child than women. The most common instances of biological mothers harming their own children arise from postpartum depression with psychotic features. The diagnosis of postpartum depression must be made within six months of birth.
Ms. Torielli testified that most people in abusive partner relationships do not discuss them publicly due to shame and fear of retaliation. Trauma affects how people respond to certain situations. Trauma could exacerbate a preexisting alcohol and substance abuse disorder. Ms. Torielli agreed that the Defendant was in a relationship with Carlos that included serious psychological and sexual abuse at the time of E.'s death. She testified about the range of impacts such abuse can cause in a general manner similar to that of Dr. Nadkarni. 

 CONCLUSIONS OF LAW
The DVSJA was enacted in 2019, amending Penal Law § 60.12 by permitting courts to impose alternative lower sentences for defendants who are victims of domestic violence. CPL § 440.47 sets forth procedural and threshold conditions that these eligible defendants are required to establish. Under PL § 60.12, the court may impose an alternate sentence if a defendant, after a hearing, establishes three factors: (1) "at the time of the instant offense, the defendant was a victim of domestic violence subjected to substantial physical, sexual or psychological abuse inflicted by a member of the same family or household as the defendant," (2) "the abuse was a significant contributing factor to the defendant's criminal behavior," and (3) "having regard for the nature and circumstances of the crime and the history, character and condition of the defendant," a sentence in accordance with general statutory standards "would be unduly harsh." PL § 60.12 (1) (a-c). Reliable hearsay is admissible at DVSJA hearings. PL § 60.12 (1). The standard of proof a defendant must meet at a DVSJA hearing is a preponderance of the evidence. People v. Addimando, 197 AD3d 106 (2d Dept 2021).
The Expansive Scope of the DVSJA
The purpose of the DVSJA was to assist victims of domestic violence who protected themselves from abusers. The Assembly memorandum in support of the statute explained the law's purpose as "reforming the unjust ways in which the criminal justice system responds to and punishes domestic violence survivors who act to protect themselves from an abuser's violence" recognizing that "[a]ll too often, when a survivor defends herself and her children, our criminal justice system responds with harsh punishment instead of with compassion and assistance." See 2019 NY A.B. 3974, NY Comm. Rep (Feb 6, 2019); People v. Angela VV., 229 AD3d 955 (3rd Dept 2024) (holding that the objective of the DVSJA was to ameliorate the unjust ways in which criminal justice system punishes domestic violence survivors who act to protect themselves from abusers); People v. Liz L., 221 AD3d 1288, 1289 (3rd Dept 2023) (holding that the DVSJA was intended to "avoid long unfair prison sentences when a survivor defends herself and her children") (internal quotation and citation omitted). 
The statute's coverage, however, goes well beyond such goals. It applies to virtually any crime an offender commits, regardless of whether that crime is directed at an abuser or even directly connected to the abuse itself. The statute also applies not only to prison but parole or post-release supervision terms, as was at issue here. The only limitation on its scope, other than [*8]the issues outlined here, is a temporal one. The domestic violence must occur "at the time of the instant offense", an undefined requirement which was not disputed in this case.
This trial court is obviously one of hundreds in which such motions are filed. Such motions, however, are now routinely made in cases having nothing to do with a crime related to an abuser. This court has considered a motion by a defendant who alleged he should be resentenced for selling large quantities of narcotics, possessing a gun and endangering the welfare of a child because he was subjected to domestic violence having no connection to his crime 30 years earlier. People v. Santiago, (Unreported Decision) Ind. # 4313 & 4247/2011 (Sup Ct, NY County, October 19, 2021) (denying DVSJA motion because abuse did not occur "at the time of the instant offense"). This court denied another motion on the same ground where the defendant concocted a scheme with his friend to burglarize, assault and rob his fiancé, with the defendant playing the role of a second victim. There was no allegation that the fiancé had ever perpetrated any domestic violence upon the defendant. People v. Tookes, Ind. # 3007/2014.
There certainly are cases in which domestic violence may be a significant contributing factor in causing a crime unelated to a victim's abuse or abuser. There are also obviously cases where an abuser coerces a victim to commit crimes. As the court in People v. B.N., 79 Misc 3d 740, 767 (Sup Ct, Cayuga County 2023) outlined in discussing the legislative history of the statute, that latter circumstance was one the DVSJA was intended to cover. The instant case bears a closer relationship to the statute's purpose than most claims now being routinely filed under the DVSJA. Here, the intimate partner violence Ms. L. was subjected to came from a member of the same household as the child she murdered. Under the DVSJA, the Legislature has determined that intimate partner violence has a unique status in the justice system. There are many mitigating factors which contribute to criminality. Defendants frequently have significant mental health issues which do not rise to a level which makes them not responsible for their crimes. Criminality is often precipitated by alcohol or substance abuse. Defendants often face difficult life circumstances like homelessness. They may have been subjected to extreme violence, including sexual violence, by a person who is not a member of their family or household. None of these defendants can come to court years later and ask for a lower sentence because of the mitigating factors which fueled their criminality. Only a person who claims they were subject to intimate partner violence can. 
Ms. L. was a Victim of Domestic Violence by a Family Member
There is no dispute in this case that, at the time of the underlying crime, the Defendant "was a victim of domestic violence subjected to substantial physical, sexual and psychological abuse" by a member of her family. PL §60.12 (1). This first requisite of the statute was met.
The Abuse was not a Substantial Contributing Factor to E.'s Murder.
The second factor the Defendant needed to establish to prevail on this motion is that the physical, sexual, or psychological abuse was a "significant contributing factor" to the underlying crime. PL § 60.12 (1) (b). There was first, in the court's view, a lack of evidence at the hearing to establish this requirement.
The Defendant's Failure to Testify
The Defendant had no obligation to testify at the hearing. The court can understand, moreover, a number of reasons why she may have chosen not to. Her counsel outlined a number of these considerations during her argument on the motion. The events leading up to and the heinous murder of E., in addition to being an horrific crime, were obviously also traumatic for [*9]Ms. L. She would doubtless have found the experience of reliving those events during testimony difficult or even impossible. Ms. L. does not remember some of events relevant to the murder. She continues to deny some of the crime's most gruesome aspects.
Dr. Nadkarni during her interview with Ms. L. recounted how, at times, the interview could simply not continue because Ms. L. was too emotional to go on. If this is what occurred in what was presumably a sympathetic interview by a trained psychologist retained by Ms. L.'s attorneys to assist her, it is easy to imagine how Ms. L. might react to being questioned and cross-examined under oath during a court proceeding. Ms. L. was represented by effective attorneys. The court could further understand how an effective attorney may have advised Ms. L. to not testify, given all of these considerations. Ms. L.'s attorney argued the motion she had brought, even absent Ms. L.'s testimony, had been "retraumatizing" for her. Summation transcript, p. 16. She argued that the DVSJA "is not meant to cause more harm to survivors by requiring them to face further questioning about their crimes". Id., p. 19. 
The court does not fault Ms. L. for not testifying. It does not fault her attorneys for not presenting her testimony. Indeed, not presenting that testimony may have been the best strategic choice for the defense. The court believes, however, that it is nevertheless required to consider the lack of any testimony by the Defendant as a lack of evidence which was relevant to its determination. There is one person who was in the best position to outline the extent to which the intimate partner violence perpetrated by Carlos impacted Ms. L.'s decision to murder E. There was no evidence at the hearing presented by that person. Rather, the court was left to consider only the testimony of the Defendant's expert, who served as a conduit for unrecorded, paraphrased, non-cross-examined statements made by Ms. L. and prior statements made by the Defendant during her parole hearings, some more than a decade ago.
Carlos' Domestic Abuse Was Not a Significant Contributing Factor to E.'s Murder
The DVSJA requires that abuse be "a significant contributing factor to the defendant's criminal behavior." PL § 60.12 (1) (b) (emphasis added). An earlier version of the statute the DVSJA amended, which provided alternative sentences for domestic violence victims, required only that such violence be "a factor in causing the defendant to commit such offense." See former PL § 60.12 (1) (b). The court believes the intimate partner violence Ms. L. was subjected to was clearly a contributory factor which helped explain E.'s murder. It did not believe this abuse was a significant contributing factor, as the statute requires. On a DVSJA motion the defendant "need not establish that the abuse she suffered was the exclusive, or even the overriding factor to her criminal conduct", but it still must be a significant contributing factor, not simply a mere factor. People v. Smith, 69 Misc 3d 1030, 1037 (Erie County Ct 2020). The abuse must have been "of a noticeably or measurably large amount, and it must have played a significant part in making the defendant's criminal behavior happen." People v. B.N., 79 Misc 3d at 768 (internal dictionary quotations omitted). The B.N. court conducted an extended analysis of this phrase and its legislative history and concluded that the phrase "significant contributing factor to the defendant's criminal behavior" necessarily required that such abuse be a causative factor in a defendant's crime. 79 Misc 3d at 765-770. This court wholly agrees with the B.N. court's analysis of that issue.
It was evident during the hearing that Ms. L.'s murder of E. was caused by a range of factors. These included her being the victim of intimate partner violence. But they also included Ms. L.'s understandable feelings of being "overwhelmed" caring for six young children; the [*10]absence of appropriate support by child protective services agencies; Ms. L.'s significant trauma as a survivor of child sexual assault over a multi-year period and her rape by a stranger shortly before E. moved back into her apartment. Two additional factors, in the court's view, were perhaps the most significant. First, was Ms. L.'s very difficult personal relationship with E. which arose in part from the child's own significant behavioral issues arising from her own trauma and Ms. L.'s belief that the child was "possessed". Second, was Ms. L.'s significant and increasing alcohol and drug abuse at the time of the murder. Among all of these causative factors, it is also obvious that in committing the murder and not seeking medical treatment for E. for two days, Ms. L. made choices. Her acts were intentional.
The fact that the murder arose, in large part, from Ms. L.'s particularly difficult relationship with E. is evidenced by the fact that Ms. L. did not murder any of her other children. That difficult relationship was documented both during the hearing and in Ms. L.'s earlier parole board parole board appearances. Dr. Nadkarni testified during the hearing about E.'s behavior:
She [E.] was urinating. She was defecating. She was smearing feces on walls. She was distressed. I mean, she was in severe distress . . . .She had been taken away from her school. She had lost her father by death. She lost her school. So there was a lot of losses, which was understandably were affecting E.'s functioning, as would for any child, and so, you know she didn't necessarily have the ability to express those emotions, and so she was acting out some of those emotions . . . .[she] like tore up about six or seven mattresses. Hearing transcript, p.51.
Ms. L. was frustrated and overwhelmed by E.'s behavioral problems. When the Defendant was questioned during the parole hearings about what caused her to throw E. against the wall, Ms. L. focused on E.'s behavioral issues and the stress they caused:
A: I didn't know my daughter had problems. I didn't know this because she was not under my custody, she was under the custody of her father . . . . E. would urinate on herself . . . and she would, you know, pass her bowels, she would put it all over the walls and everything, I used to tell her, why is you doing this to me?
See Parole minutes, July 28, 2010
A: And then a couple of months later that's when she just like was doing — like being bad to me. She used to piss on herself and I used to tell her "Why you do this to me, E.?" She said "Well, this is what I used to do over there."
Q: Did that upset you?
A: Yes.
See Parole minutes, July 12, 2016.
The Defendant targeted the child not only because of her frustration and anger with her behavioral issues, but also because the Defendant was convinced that E. was under a spell and that Gustavo's family made her eat snakes. It was also documented that the Defendant spoke at length about her belief that Gustavo was involved in witchcraft (Santeria) and had taught the child to practice voodoo. Defendant's Exhibit D. Ms. L. believed that E. was possessed by the devil. At her parole hearing in 2014, Ms. L. justified inserting a hairbrush into the child's anus in order to remove snakes.
The evidence at the hearing also established that the Defendant had a history of severe drug and alcohol abuse and psychological issues well before she met Carlos. The court has no [*11]doubt that Carlos' abuse was one of a number of factors which exacerbated Ms. L.'s alcohol and substance abuse. This, in turn, then contributed to the factors which led Ms. L. to commit the murder. Ms. L. started drinking at the age of eight and her drinking increased during the years. After the Defendant was awarded custody of E., the child began to exhibit behavior problems which had a negative effect on Ms. L. and caused her to drink heavily. While Dr. Nadkarni testified that Carlos' abuse exacerbated Ms. L.'s substance abuse issues, there was no evidence presented other than Dr. Nadkarni's opinion to support that claim. During her parole hearings the Defendant consistently blamed her actions on the day of the murder to her use of drugs and alcohol: 
Q: This was an innocent vulnerable, defenseless child and to have gone through all of that at the hands of her mother . . . [w]hat was going on in your life at that time?
A: I'm going to be real honest with y'all . . . .At the time I was doing heavy drugs . . . I was an alcoholic.
Q: So what happened that it escalated to such horrendous behavior —
A: I didn't know my daughter had problems. I didn't know this because she was not under my custody, she was under the custody of her father . . . . E. would urinate on herself . . . and she would, you know, pass her bowels, she would put it all over the walls and everything, I used to tell her, why is you doing this to me . . . And you know, with my drunkenness and my drinking and more drugs that I did, instead of reporting more tension, I didn't.
Q: So what happened during this time that it escalated to this level?
A: And one day I just couldn't no more, and I couldn't see back then, because she was — E. would do me so many things you know what I'm saying? I would say E., why? And that night I just was drunk and I pushed her . . . .I was on drugs and drinking.
See Parole minutes, July 28, 2010.
Q: Tell me what you did to her.
A: One day I was drunk and I pushed her and I didn't know how hard I pushed her. I didn't realize how hard I pushed her. I was drunk.
Q: Is that because you were so drunk you didn't know what was going on?
A: Yes
Q: Now you had been drinking and using drugs for a while when this occurred?
A: Yes
See Parole minutes, July 10, 2012
Ms. L.'s severe alcohol and substance abuse issues did not begin when she met Carlos. They were a condition which had apparently significantly impacted her life since she was 8 years old.
The court credited Dr. Nadkarni's description of the coercive control Ms. L. believed Carlos had over her. The court also understands, as Dr. Nadkarni testified, that Ms. L. felt this control even when Carlos was absent. It is relevant, however, that Carlos was incarcerated and had been for a week when the murder occurred. Upon hearing of E.'s condition after Ms. L. slammed her head into a wall, Carlos directed Ms. L. to take the child to the hospital. This conversation occurred the day after the assault and hours after E.'s estimated time of death. Following this conversation, however, Ms. L. did not take the child to the hospital. She did not comply with Carlos' directions. She did not take actions in accordance with his coercive control. She did the opposite. As Ms. Toriello testified, this was contrary to what would be expected if a [*12]person was taking actions in accordance with the coercive control being exerted by the perpetrator of intimate partner violence.
Dr. Nadkarni testified that while there is literature which links intimate partner violence to child abuse and neglect by a victim there is more which links such abuse to violence against a perpetrator. Ms. Torielli testified that it was rare for a victim of intimate partner violence to commit violence against a person who was not the victim's abuser. Most such instances occur with male offenders. Even for women offenders, moreover, violence against children is most often seen associated with post-partum depression, a condition which Ms. L. was not experiencing at the time of the murder. It of course goes without saying that the survivors of intimate partner violence almost never engage in the kind of extended, horrific course of child abuse ending in murder which occurred here. The crime garnered such outsized national attention because of how almost uniquely horrifying it was. The defense presented reasonable arguments in support of their view that intimate partner violence was a significant contributing factor in E.'s murder. That claim, however, in the court's view, was not only unproven at the hearing. It was also inconsistent with the kinds of crimes survivors of intimate partner violence are sometimes known to commit. 
Even Dr. Nadkarni apparently found it difficult to draw the ultimate conclusion that the intimate partner violence Carlos perpetrated was a significant contributing factor in E.'s murder. When she was directly asked to opine on that ultimate issue multiple times, she declined to do so. She first answered the question by saying that the abuse was ongoing. She then again described the cognitive impacts the abuse had caused. Next, she opined that both domestic violence and alcohol and substance abuse were "contributing factors" which led to the murder, a proposition the court agrees with. She later said: "I don't want to speak in terms of causation", opining that was the court's prerogative. This followed the court's overruling of an objection by the People on a previous hearing date in which the court had rejected that argument and ruled, in Dr. Nadkarni's presence, that she would be permitted to opine on the ultimate issue. Dr. Nadkarni described the intimate partner violence as an "umbrella" with respect to Ms. L.'s mental health issues. Finally, at the very end of her testimony, on re-direct examination, for the first time, she opined that the intimate partner violence "had created a significant contribution to her [Ms. L.'s] behavior".
The Sentence Ms. L. Was Given Was Not Unduly Harsh.
Even if the abuse was a significant contributing factor to the Defendant's criminal behavior, the Defendant's sentence, in the court's view, was not unduly harsh. A determination as to whether a sentence is unduly harsh requires a consideration of "the nature and circumstances of the crime," as well as "the history, character and condition of the defendant." PL § 60.12 (1) (c). The Defendant was sentenced to fifteen years to life imprisonment, the minimum sentence she could have received. The People recommended this sentence in order to spare E.'s siblings, who witnessed the circumstances surrounding her murder, the trauma of testifying at trial. The Defendant has already served 26 years of incarceration. The question now is whether she should be subject to lifetime parole.
In considering whether to impose a less punitive sentence, the court must consider the nature and circumstances of the crime. It outlined those facts in detail earlier and will not repeat them. They are painful even to read much less contemplate. In the court's view, the horrific nature of E.'s murder argues against granting the relief sought here.
The DVSJA obviously authorizes reduced sentences for the most serious of crimes, including murder. Even when considering convictions for violent crimes, however, appellate courts have found sentences not unduly harsh where the circumstances of a crime were particularly heinous. In People v. Wendy B.-S., 229 AD3d 1317 (4th Dept 2024) the court affirmed a trial court judgment holding the Defendant's remaining lifetime parole sentence was not unduly harsh where the Defendant had aided her husband in bludgeoning the victim to death to prevent him from further cooperating with authorities to implicate the defendant and her husband in other crimes. The court found the Defendant's crimes were "as brutal as they were reprehensible". 229 AD3d at 1321. 
In People v. Fisher, 221 AD3d 1195 (3rd Dept, 2023) the court found the sentence imposed on a 20 year-old woman who attacked her father with a baseball bat while he was lying in bed fracturing his face and skull and causing him to lose an eye, then attacked her mother, causing multiple injuries and fracturing her arm was not unduly harsh. The court cited "the horrific nature and the circumstances surrounding defendant's conduct". 221 AD3d at 1197. It is difficult to imagine a more egregious crime than occurred in this case. 
The Defendant contends that lifetime parole is a substantial burden for her. She is required to have twice monthly in-person office check-ins with her parole officer. Twice a month parole officers conduct unannounced in-person visits at her apartment between 8:00 p.m. and 8:00 a.m. She is subject to polygraph tests. While the Defendant says she has needed permission from parole to visit her son or take a friend to an appointment, there is no evidence she has ever been denied the opportunity to travel to visit relatives. The court would also note that parole authorities are empowered, on a discretionary basis, to eliminate parole supervision terms for offenders who have served at least three years of unrevoked parole supervision. Executive Law § 259-j. There was no evidence presented at the hearing about whether Ms. L. would have a realistic prospect of benefitting from this provision in the near future.
The statements made by the Defendant about her crimes on this motion primarily came from parole board hearings. At times during these hearings the Defendant expressed remorse about E.'s murder. The court believes she sincerely regrets what happened. In the past, Ms. L. has also ascribed the murder to causes other than her own culpability. When asked in 2010: "So, what happened during this time that it escalated to this level?", the Defendant responded "And one day I just couldn't no more and I couldn't see back then, because she was — E. would do me so many things you know what I'm saying? I would say, E. why?" See Parole Minutes, July 28, 2010. When asked about inserting a brush in E.'s anus, she excused it as trying to help with "constipation." Id. She also denied ever making the child eat her own feces and blamed the prosecutor for misleading her by saying if she confessed to that, they would help her. See Parole Minutes July 17, 2018. She denied locking E. in her room and leaving her alone for periods of time and denied knowledge of how E. received sores on her body. Id.
When denying the Defendant parole on an earlier occasion, the parole board noted that the Defendant appeared to "feel that some of [her] actions were justified." See Parole Minutes, July 28, 2010. The board noted that the Defendant showed "limited remorse for the terror [E.] endured." See Parole Minutes, July 17, 2018. Even Dr. Nadkarni testified that when she interviewed the Defendant for this hearing, the Defendant minimized her role in the child's death. Defense counsel argues that the Defendant did not know that she could have an interpreter at the parole hearings until 2020 and that she was participating in these hearings not [*13]having a full comprehension of what was occurring. The court is not aware, however, of any evidence over the decades that the Defendant sought but was denied the services of an interpreter. The first and only time an interpreter was apparently used was during her parole hearing on July 14, 2020. None was requested on this motion.
The court also understands, however, why Ms. L. may have given varying accounts of her culpability for the murder over the years. The trauma Ms. L. was subjected to obviously impacted her memories, cognition and emotions. The court also acknowledges Ms. L.'s significant efforts and accomplishments to lead a productive and law-abiding life. They are commendable and even more impressive because of the very difficult circumstances she has had to overcome. She has completed her mandated programming at RevCore Recovery Services and been involved with numerous other organizations since her release. She has re-enrolled in school to obtain her High School Equivalency degree. She has apparently maintained her sobriety. She aspires to help other victims of intimate partner violence to heal. It is remarkable she is doing as well as she is.
The Defendant cited this Court's decision in People v. S.S., 79 Misc 3d 1235 (Sup Ct, NY County 2023) to support her position that lifetime parole is unduly harsh. In that case this Court granted the Defendant's motion under the DVSJA to eliminate a lifetime parole term for a transgender woman who murdered the former roommate, who she testified had previously subjected her to rape and other forms of intimate partner violence. As this Court stated in its decision "[t]his case . . . concerns a circumstance at the heart of the statute's purpose: a case in which a defendant commits a crime against their abuser, and commits that crime by virtue of the abuse which was perpetrated on the Defendant." 79 Misc 3d at *8. The court certainly understands that the DVSJA covers not only crimes against an abuser but against anyone else, even when an abuser has no direct connection to a crime. The Legislature has determined that such cases warrant sentence reductions in appropriate cases. In the court's view, however, this case is not one the Legislature intended to be covered under the DVSJA. 
The Court finds that the Defendant did not establish by a preponderance of the evidence that the abuse she suffered was a significant contributing factor in her murder of E. or that her sentence was unduly harsh. For all of those reasons, the Defendant's motion is denied. This constitutes the Decision and Order of this court.
November 1, 2024
Daniel P. Conviser, A.J.S.C.

Footnotes

Footnote 1:The court has used initials rather than names for the Defendant, the child victim and others both in this decision and in quotes from parole board minutes, in which the first name of the child was used.

Footnote 2:Facts
concerning the underlying crime are based on the motions of the People and Defendant, including attached exhibits.